1  WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| John Russell, | No. CV-16-00193-TUC-LCK |
|---|---|
| Plaintiff, | **ORDER** |
| v. | |
| Nancy A. Berryhill, | |
| Defendant. | |

Plaintiff John Russell filed this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision by the Commissioner of Social Security (Commissioner). (Doc. 1.) Before the Court are Russell's Opening Brief, Defendant's Brief, and Russell's Reply. (Docs. 16, 17, 18.) The parties have consented to Magistrate Judge jurisdiction. (Doc. 12.) Based on the pleadings and the administrative record submitted to the Court, the Commissioner's decision is affirmed.

**FACTUAL AND PROCEDURAL HISTORY**

Russell filed an application for Disability Insurance Benefits (DIB) on July 27, 2012. (Administrative Record (AR) 140.) He alleged disability from May 13, 2012. (*Id.*) Russell's application was denied upon initial review (AR 65-78) and on reconsideration (AR 79-93). A hearing was held on May 19, 2014 (AR 28-64), after which the ALJ found that Russell was not disabled because he could perform other work available in the national economy (AR 13-23). The Appeals Council denied Russell's request to review the ALJ's decision. (AR 1.)

## FACTUAL HISTORY

Russell was born on January 24, 1961, making him 51 years of age at the onset date of his alleged disability. (AR 148.) Russell worked as a carpenter until 2009. (AR 162.) After he was laid off in 2009, he unsuccessfully sought work up until he applied for disability. (AR 35-37.)

The ALJ found Russell had several severe impairments: rheumatoid arthritis, osteoarthritis, degenerative disc disease of the lumbar spine, lupus, and headaches. (AR 15.) The ALJ determined Russell had the RFC to perform light work, except he could only frequently climb, stoop, kneel, crouch, and crawl. (AR 18.) The ALJ concluded at Step Five, based on the Medical-Vocational Guidelines and the testimony of a Vocational Expert, that Russell could perform other work that exists in significant numbers in the national economy. (AR 22-23.)

## STANDARD OF REVIEW

The Commissioner employs a five-step sequential process to evaluate DIB claims. 20 C.F.R. § 404.1520; *see also Heckler v. Campbell*, 461 U.S. 458, 460-462 (1983). To establish disability the claimant bears the burden of showing he (1) is not working; (2) has a severe physical or mental impairment; (3) the impairment meets or equals the requirements of a listed impairment; and (4) claimant's RFC precludes him from performing his past work. 20 C.F.R. § 404.1520(a)(4). At Step Five, the burden shifts to the Commissioner to show that the claimant has the RFC to perform other work that exists in substantial numbers in the national economy. *Hoopai v. Astrue*, 499 F.3d 1071, 1074 (9th Cir. 2007). If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, she does not proceed to the next step. 20 C.F.R. § 404.1520(a)(4).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995) (citing *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989)). The findings of the Commissioner are meant to be conclusive if supported by substantial evidence. 42

U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla but less than a preponderance." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (quoting *Matney v. Sullivan*, 981 F.2d 1016, 1018 (9th Cir. 1992)). The court may overturn the decision to deny benefits only "when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001). This is so because the ALJ "and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney*, 981 F.2d at 1019 (quoting *Richardson v. Perales*, 402 U.S. 389, 400 (1971)); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004). The Commissioner's decision, however, "cannot be affirmed simply by isolating a specific quantum of supporting evidence." *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998) (citing *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989)). Reviewing courts must consider the evidence that supports as well as detracts from the Commissioner's conclusion. *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975).

**DISCUSSION**

Russell argues the ALJ committed three errors: (1) he failed to find additional severe impairments at Step Two; (2) he failed to attribute any limitations to Russell's headaches; and (3) he improperly evaluated Russell's credibility.

**Step Two**

Russell argues the ALJ failed to find, at Step Two, that his hand tremors and mental impairments were severe impairments.[1]

A finding of disability requires an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment." 20 C.F.R. § 404.1505. A physical or mental impairment must last or be expected to last for 12 or

---

[1] In his Opening Brief, Russell included digestive problems in the caption for this argument. However, he provided no argument on this subject in the body of the brief or the Reply. (Doc. 16 at 16-19; Doc. 18 at 3-5.) Therefore, the Court does not address whether the ALJ should have found digestive problems to be a severe impairment.

more months and must be "established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms." 20 C.F.R. §§ 404.1508, 404.1509. An impairment is "not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 1521.

### Hand Tremors

Russell argues that his hand tremors are severe and that they made it difficult for him to use his hands. When questioned by the ALJ, Russell stated that the tremors had gotten much worse in the three months prior to the May 2014 hearing. (AR 45.) Doctors observed and diagnosed Russell as having a tremor in 2012. (AR 444 (06/18/12), 442 (09/20/12), 595, 600 (12/05/12).) No subsequent records document a tremor. In particular, tremors are not mentioned in the medical records from early 2014. (AR 656, 698-702.) There are no medical records indicating that Russell experienced hand tremors significantly limiting his ability to work for a period of 12 or more months. Therefore, it was not error for the ALJ not to include this as a severe impairment at Step Two.

### Mental Impairments

Russell argues there was substantial evidence that he experienced anxiety and depression at the level of a severe impairment. The ALJ concluded, "the claimant's medically determinable mental impairment of depression does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and is therefore nonsevere." (AR 15.) In particular, the ALJ determined Russell had only mild limitations in activities of daily living, social functioning, and concentration, persistence, and pace. (AR 15-16.)

The ALJ did not discount that Russell had been diagnosed with a medically determinable impairment; however, he concluded any mental impairment was not severe. Thus, the Court examines the medical opinions on Russell's functional limitations arising from his mental impairment. The ALJ gave great weight to the assessments of examining psychologist Dr. Kettner and the state agency consulting psychologists, all of whom

found Russell's mental impairments to be not severe. The ALJ gave little weight to the opinion of treating psychologist Lothar Mader.

On January 9, 2014, treating psychologist Dr. Mader provided a mental RFC that was quite limited. He stated that Russell had limited but satisfactory ability to understand, remember, and carry out simple instructions, and adhere to basic cleanliness; had serious limitations to remember work-like procedures, work in proximity to others, make simple work decisions, get along with co-workers or peers, and be aware of normal hazards; was unable to meet competitive standards to sustain an ordinary routine, ask simple questions, accept instruction and criticism, maintain socially appropriate behavior, and travel in unfamiliar places; and had no ability to maintain attention for 2-hour segments, maintain regular attendance, complete a normal work day or week without psychological interruptions, perform at a consistent pace without unreasonable breaks, respond to changes in work setting, deal with work stress, understand, remember and carry out detailed instructions, set goals independently, deal with the stress of semiskilled work, interact appropriately with the public, and use public transportation. Mader also concluded that Russell's psychological impairments would cause him to miss work more than 3 times per month. (AR 672-74.)

Generally, a treating physician's opinion is afforded more weight than the opinion of an examining physician, and an examining physician's opinion is afforded more weight than a non-examining or reviewing physician's opinion. *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001). When there are contradictory medical opinions, to reject a treating physician's opinion, the ALJ must provide "specific and legitimate reasons that are supported by substantial evidence." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005). Here, psychologist Mader's opinion was contradicted by Dr. Kettner and the state agency consulting psychologists.

The ALJ stated that he gave little weight to Dr. Mader's opinion because it was "so extreme as to appear implausible," especially in light of Russell's self-described daily activities and history of mental health treatment. (AR 17.) As for Russell's daily

- 5 -

activities, as noted by the ALJ, Russell helped care for his disabled wife without outside assistance, which contradicts Dr. Mader's very restrictive findings. (*Id.*) Further, Russell has acknowledged that he went grocery shopping, although Dr. Mader found that Russell had no ability to function in the area of public interaction. (*Id.*) Although Russell and his wife reported that he did no socializing, they both stated that he did not have problems getting along with others, including authority figures (AR 182, 183, 215, 216); this contradicts Dr. Mader's findings that Russell was seriously limited in getting along with, and working in proximity to, others, and that he was unable to perform competitively in accepting instruction and criticism. There is substantial evidence to support the ALJ's finding based on Russell's daily activities.

Next, although Russell was prescribed medication for anxiety by his primary care doctors from at least March 2011 (AR 251), he did not seek mental health treatment until July 2013 (AR 714). He had been participating in counseling with Dr. Lothar only since October 2013. However, he reported anxiety and/or depression for the prior 15 years. (AR 693 (reporting 15 years of anxiety to Dr. Mader); *see also* AR 249 (May 17, 2011, PA Clark diagnosed "chronic anxiety"); AR 444 (June 18, 2012, reports "long standing" panic attacks to Dr. Moore); AR 505 (October 27, 2012, telling Dr. Kettner that he had depression for "a long time").) There is substantial record evidence that Russell reported long-standing mental health issues but he had been able to work full-time despite those symptoms. Additionally, despite reporting long-standing symptoms, the record documents only six months of psychological treatment.

The ALJ noted that Dr. Mader recommended only conservative care, not more frequent counseling or psychiatric hospitalization. (AR 17.) Dr. Mader informed the insurance company there was no imminent risk of hospitalization and he assigned a Global Assessment of Functioning (GAF) score of 50 to 60, suggesting moderate symptoms.[2] (AR 672-74.) In October 2013, Dr. Mader recommended counseling two to

---

[2] "A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." *Vargas v. Lambert*, 159 F.3d 1161, 1164 n.2 (9th Cir. 1998) (referring to *Am. Psychiatric Ass'n Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 2002) (DSM-IV)). A

four times per month. (AR 674.) In January 2014, he suggested counseling two times per month. (AR 673.) Russell attended counseling approximately every two to three weeks. (AR 687, 692-95.) There is substantial evidence to support the ALJ's finding that Dr. Mader proscribed only conservative treatment.

Finally, the ALJ found Dr. Mader's opinion inconsistent with the remainder of the record. In addition to the evidence detailed above, Dr. Kettner and the two reviewing psychologists, Drs. Weiss and Solomon, all concluded Russell had only mild impairments. (AR 72, 87, 507.) Thus, there is substantial evidence to support this finding by the ALJ. Russell argues that the examining and consulting physicians' opinions should not have been given more weight than Dr. Mader's opinion, because they did not have the opportunity to review Russell's psychological treatment records. However, the ALJ had the entirety of Russell's records and it was his job to resolve conflicts in medical testimony. *See Andrews*, 53 F.3d at 1039. After reviewing all of the records, the ALJ provided specific and legitimate reasons to reject the opinion of Dr. Mader, and these reasons were supported by substantial evidence. Therefore, the ALJ did not err in finding at Step Two that Russell did not have severe mental health impairments.

**Headaches**

Russell argues the ALJ determined headaches to be a severe impairment but did not include any limitations arising from the headaches. For example, Russell argues it would make sense to have a limitation on noise or task complexity, or an allowance for extra breaks. Russell does not point to any doctors that suggested such a limitation based on his headaches. In fact, in a Headache Questionnaire, Russell stated that no doctor had given him any restrictions due to his headaches and that he was not seeing a doctor specifically for treatment of his headaches. (AR 204.) He also stated he had been having severe headaches since 2005, when he was still working. (AR 203.) Plaintiff has not established the ALJ erred in not finding additional limitations related to his headaches.

---

rating of 51 to 60 indicates moderate symptoms or "moderate difficulty in social, occupational, or school functioning." DSM-IV at 34.

Additionally, the jobs the Vocational Expert and ALJ identified were all unskilled, meaning they "need [ ] little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 404.1568(a). Thus, the jobs were limited in task complexity as suggested by Russell. He has not established a harmful error.

**Credibility**

Russell argues the ALJ erred in not finding his symptom testimony credible. In a September 23, 2012 Function Report, Russell stated that his entire body hurt daily, he had frequent headaches, he had major depression, and he was in fear because of all the medications he was taking. (AR 210.) He reported that he and his wife helped care for one another and their cats; he cooked every other day (but it took a while); he helped with dishes; and was doing less and less yardwork (only 10-20 minutes at a time). (AR 211, 212.) He would drive and go to the grocery store two times per month. (AR 213.) He stated that he could not walk far and could not concentrate for more than an hour, and he did no socializing or activities. (AR 214, 215.)

On May 19, 2014, Russell testified to the ALJ that he had rheumatoid arthritis, osteoarthritis, degenerative disc disease, lupus, depression with anxiety, headaches, collapsed feet, and bipolar disorder. (AR 57-58.) All of his joints hurt even with medication; however, he stated that the medication reduced his pain by fifty percent. (AR 45-46.) Russell testified at the hearing that he used to cook a lot but his hands shook so badly that he tossed things out of the pan. (AR 44.) He did dishes and took out the trash, but he did not sweep, mop, vacuum, or do laundry. (AR 47.) He did no yard work except occasional mowing before the sun came up because he has a phobia of the sun. (AR 48-49.) He grocery shopped when he needed to pick up prescriptions but entering the store made him sick due to his fear of people and sickness. (AR 47.) He had no hobbies, but did watch a little television; he could send an email or search something on the computer but had difficulties with shaking. (AR 49, 56.) Russell stated he could not lift twenty pounds, could not stand/walk for even two hours, and could not sit for six hours. (AR 52, 54.) Russell stated he had problems climbing, stooping, kneeling, crouching, crawling,

and handling. (AR 54-55.) He testified that he used a cane approximately five times per month, when his hip was particularly painful. (AR 58.) He stated he had headaches each morning, along with diarrhea; he's sick for approximately three to four hours. (AR 59.) Russell stated he had mood swings and would get angry. (AR 60.)

Russell challenges the ALJ's finding that his symptom testimony was not fully credible. (AR 20.) The ALJ noted several factors in making his credibility finding: Russell's daily activities were inconsistent with his assertion of disabling limitations; Russell received conservative treatment, monthly office visits and medication; he benefited from the medication he was prescribed; the medical record and opinions were inconsistent with his allegations; Russell stopped working due to a layoff and there was no record evidence that his condition declined since that time; and Russell's appearance and demeanor at the hearing. (AR 20-21.)

In general, "questions of credibility and resolution of conflicts in the testimony are functions solely" for the ALJ. *Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir. 2007) (quoting *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982)). However, "[w]hile an ALJ may certainly find testimony not credible and disregard it . . . [the court] cannot affirm such a determination unless it is supported by specific findings and reasoning." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 884-85 (9th Cir. 2006); *Bunnell v. Sullivan*, 947 F.2d 341, 345-346 (9th Cir. 1995) (requiring specificity to ensure a reviewing court the ALJ did not arbitrarily reject a claimant's subjective testimony); SSR 96-7p. "To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007).

Initially, "the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* at 1036 (quoting *Bunnell*, 947 F.2d at 344). The ALJ found Russell had satisfied part one of the test by proving an impairment that could produce the symptoms alleged. (AR 20.) Next, if "there is no affirmative

evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1281, 1283-84 (9th Cir. 1996)). Here, the ALJ did not make a finding of malingering. Therefore, to support his discounting of Russell's assertions regarding the severity of his symptoms, the ALJ had to provide clear and convincing, specific reasons. *See Garrison v. Colvin*, 759 F.3d 995, 1014-15 (9th Cir. 2014); *Vasquez v. Astrue,* 572 F.3d 586, 591 (9th Cir. 2008) (quoting *Lingenfelter*, 504 F.3d at 1036).

First, the ALJ found that Russell received conservative treatment, monthly office visits and medication, and he benefited from the medication he was prescribed. According to the administrative record, Russell saw his rheumatologist four times in 2012 (AR 370, 401, 407, 532) and one time in 2013 (AR 538). He saw his primary care physician, Dr. Moore, eight times total during 2012 and 2013. (AR 444.) He did six weeks of physical therapy in 2012 (AR 448-51), and he had one neurology appointment in 2012 (AR 595). Accounting for a few other miscellaneous records, Russell had not aggressively sought care since the alleged onset date. Although he continued to report pain, Russell noted improvement with medication to his doctor and the ALJ. (AR 407 (September 12, 2012, much better than he has ever been), AR 532 (December 13, 2012, hands are better), AR 538 (March 12, 2013, significant benefit to hands/wrists from Golimumab), AR 45-46 (May 19, 2014 hearing, Methotrexate decreases pain by 50%). There is, at least, substantial evidence to support these two findings by the ALJ. *See Valentine v. Comm'r Social Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009) (defining substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."); *Batson*, 359 F.3d at 1196 ("When evidence reasonably supports either confirming or reversing the ALJ's decision, we may not substitute our judgment for that of the ALJ.").

Second, the ALJ found that the medical record and opinions were inconsistent with Russell's allegations. As noted above, Russell did not pursue frequent medical care

in light of his assertions of disabling limitations. Most critical is the absence of medical opinions supporting the limitations he asserted. Examining physician Dr. Kinnison and reviewing physicians, Drs. Tambellini and Battis, found that Russell could perform at least light work. (AR 74-75, 88-89, 513-14.) No treating physician completed a physical residual functional capacity assessment assessing him to be more limited than these opinions. Thus, his allegations are in contrast to the medical opinions of record.

In his Opening Brief, Russell took issue only with the ALJ's finding that his daily activities were inconsistent with his assertion of disabling limitations. The Court found that the ALJ provided more than one adequate clear and convincing reason, supported by substantial evidence, for his credibility finding; therefore, the Court need not review the other grounds upon which the ALJ relied. *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162-63 (9th Cir. 2007) (finding it harmless for ALJ to rely upon some erroneous grounds to reject credibility, because he relied upon numerous valid reasons supported by substantial evidence).

**Medical-Vocational Guidelines**

Russell states that since the ALJ issued his decision, Russell has turned 55. At the age of 55, he argues he is now disabled under Grid Rule 202.02 based on the RFC for light work as found by the ALJ. Therefore, he contends the Court should find that he has been entitled to benefits since January 24, 2016. This Court is reviewing only the ALJ's September 12, 2014 decision, and can overturn that decision only if it is legally erroneous or not supported by substantial evidence. *See Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001). The Court has reviewed the arguments presented by Russell and has not found any error.

## CONCLUSION

The Court concludes the ALJ did not err as to any of the claims raised by Russell. Therefore, Russell is not entitled to relief and his appeal is denied.

Accordingly,

**IT IS ORDERED** that Plaintiff's case is **DISMISSED** and the Clerk of Court shall enter judgment.

Dated this 25th day of May, 2017.

*[signature]*
Honorable Lynnette C. Kimmins
United States Magistrate Judge